UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JASON LATIMORE,                    )
                                   )
                Plaintiff,         )
        v.                         )          CIVIL ACTION
                                   )          NO. 12-12260-JGD
DEPARTMENT OF CORRECTIONS,         )
et al.,                            )
                                   )
                Defendants.        )

## MEMORANDUM OF DECISION AND
## ORDER ON DEFENDANTS' MOTION TO DISMISS

November 22, 2013

DEIN, U.S.M.J.

## I.  INTRODUCTION

The plaintiff, Jason Latimore ("Latimore"), has brought this action pro se against

the Massachusetts Department of Correction ("DOC") and thirteen of its officials and

employees.  Latimore claims that while he was incarcerated at MCI-Norfolk and later at

MCI-Walpole,[1] the defendants carried out an unlawful conspiracy to deprive him of his

property by confiscating and destroying a number of his legal pads containing original

musical works and business plans.  By his complaint, Latimore has asserted fifteen claims

against the defendants, including claims under 42 U.S.C. § 1983 ("Section 1983") for

---

[1]  The Walpole facility is now known as MCI-Cedar Junction.  However, because the
plaintiff has referred to it as MCI-Walpole throughout his complaint, this court will refer to it as
MCI-Walpole throughout this decision in order to avoid any confusion.

violations of his federal constitutional rights (Counts II-VIII and XV), and claims for violations of his rights under Massachusetts state law (Counts I, and IX-XIV).

The matter is presently before the court on the "Defendants Motion to Dismiss" (Docket No. 25).  By their motion, the defendants contend that all of Latimore's claims should be dismissed, pursuant to Fed. R. Civ. P. 8(a) and 12(b)(6), because the complaint fails to comply with applicable pleading standards or to state a claim upon which relief may be granted.  Additionally, the defendants contend that this court lacks subject matter jurisdiction over this case because Latimore has pled nothing more than a state law tort claim, which is not enforceable under Section 1983.  Accordingly, the defendants are seeking dismissal pursuant to Fed. R. Civ. P. 12(b)(1)  as well.

For all the reasons detailed herein, the defendants' motion to dismiss is ALLOWED.  A most generous reading of the complaint leads to the conclusion that while the plaintiff steadfastly asserted that his personal papers were missing, the defendants at both MCI-Norfolk and MCI-Walpole undertook efforts to locate the property but they were unable to do so.  There are no factual allegations to support the conclusory assertions of intentional wrongdoing.  Therefore, and as detailed more fully herein, this court finds that Latimore has failed to state a plausible claim for a violation of his federal constitutional rights, and his Section 1983 claims (Counts II-VIII and XV) are hereby dismissed pursuant to Fed. R. Civ. P. 12(b)(6).  Additionally, this court declines to exercise supplemental jurisdiction over the plaintiff's state law claims.  Therefore, Counts I and IX-XIV are dismissed without prejudice.

## II.  STATEMENT OF FACTS

When ruling on a motion to dismiss brought under Fed. R. Civ. P. 12(b)(6), the court must accept as true all well-pleaded facts, and give the plaintiff the benefit of all reasonable inferences.  See Cooperman v. Individual, Inc., 171 F.3d 43, 46 (1st Cir. 1999).  Where, as here, the plaintiff is proceeding pro se, the court must construe his allegations liberally.  See Estelle v. Gamble, 429 U.S. 97, 106, 97, S. Ct. 285, 292, 50 L. Ed. 2d 251 (1976) (a pro se complaint, however inartfully pleaded, must be liberally construed).  In doing so, the court "may consider, in addition to the complaint itself, a limited array of additional documents such as any that are attached to the complaint and 'documents sufficiently referred to in the complaint.'"[2] Giragosian v. Bettencourt, 614 F.3d 25, 27-28 (1st Cir. 2010) (quoting Miss. Pub. Emp. Ret. Sys. v. Boston Scientific Corp., 523 F.3d 75, 86 (1st Cir. 2008)).  While this court agrees with the defendants that the lengthy complaint is at times difficult to follow, the court is satisfied that the following factual description accurately summarizes the allegations of the complaint.

## The Parties

The plaintiff, Latimore, is an individual who resides in the Commonwealth of Massachusetts.  (Compl. (Docket No. 1) ¶ 4).  During the time period at issue in this case, Latimore was an inmate in the custody of the DOC.  (Id.).  Initially, he was housed at MCI-Norfolk.  (See id. ¶ 6).  However, in mid-November 2011, Latimore was transferred

---

[2]  The plaintiff has attached two sets of exhibits to his complaint (see Docket Nos. 1-1 and 1-2), which shall be cited herein as "Pl. Ex. __."

to MCI-Walpole, where he was housed in the Department Disciplinary Unit ("DDU"). (Id. ¶¶ 27, 35).

At all relevant times, each of the individual defendants was an official or employee of the DOC working in either MCI-Norfolk or MCI-Walpole.  (See id. ¶ 5).  Thus, in addition to the DOC, the named defendants include the Superintendent of MCI-Norfolk, Gary Roden ("Roden"); the Deputy Superintendent of MCI-Norfolk, Cynthia Sumner ("Sumner"); the Director of Security at MCI-Norfolk, William Grossi ("Grossi"); and three employees of MCI-Norfolk, including Sergeant O'Malley ("O'Malley") and Correctional Officers Sullivan ("Sullivan") and King ("King").  The defendants also include the Superintendent of MCI-Walpole, James Saba ("Saba"); the Deputy Superintendent of MCI-Walpole, Suzanne Thibault ("Thibault"); the Internal Grievance Coordinator at MCI-Walpole, Robert Stork ("Stork"); and four employees of MCI-Walpole, including Sergeant Sinclair ("Sinclair") and Correctional Officers Park ("Park"), Swanson ("Swanson") and Ballentine ("Ballentine").  In his opposition to the motion to dismiss, Latimore has agreed that his claims against Thibault, Swanson and Ballentine should be dismissed.  (See Pl. Opp. Mem.  (Docket No.  21) at 17, 20).

As described below, while Latimore has named numerous defendants, he has failed in many instances to identify their specific involvement in the challenged trans-actions, and has failed to plead facts to support his conclusory assertions of wrongdoing. For these reasons, as well as the other reasons discussed below, this court finds that his claims against the remaining defendants should be dismissed as well.

## Alleged Deprivation of Property at MCI-Norfolk

The events giving rise to this action began on June 16, 2011, when Latimore was incarcerated at MCI-Norfolk. At that time, the plaintiff was involved in a physical altercation with a number of his fellow inmates. (Compl. ¶ 6). Following the altercation, Latimore was taken to administrative segregation, in accordance with DOC policies, where he was questioned about the fight by defendants O'Malley and King from the prison's Internal Perimeter Security ("IPS") department. (Id. ¶ 7). Latimore claims that during the course of the questioning, he was asked whether he had any gang involvement or affiliation with any type of Security Threat Group ("STG"). (Id.). He further claims that he denied having any involvement with any such groups. (Id.).

Subsequently, Latimore was confined in administrative segregation and his property was transferred to the facility's property department. (Id. ¶ 8). The plaintiff does not dispute that the transfer of his property occurred pursuant to DOC policy. (Id.). However, he claims that he never received a cell inventory form listing all of the property that was sent to the property department, and that his requests for such a form went unanswered. (Id.). He further claims that the failure to provide him with a cell inventory form constituted a violation of DOC policy. (Id.).

After Latimore was transferred to administrative segregation, he grew increasingly concerned about his property. (Id. ¶ 9). In particular, the plaintiff was concerned about ten legal pads, which allegedly contained his original musical works, "hundreds o[f] choruses/hooks for future music compositions[,]" and business plans that he had created

over the course of three years while he was in DOC custody.  (Id. ¶¶ 9-10).  Latimore

claims that he spent the next three months attempting to recover his legal pads by

repeatedly contacting defendant Sullivan, who was the property officer at MCI-Norfolk.

(Id. ¶ 12).  In September 2011, Sullivan brought Latimore his property.  (Id.).

After recovering his property, Latimore allegedly realized that his most recent

legal pad of music was missing, and he alerted Sullivan to the problem.  (Id. ¶¶ 12-13).

Sullivan responded by telling the plaintiff that the material he had received constituted all

of the property that the DOC had been holding for him in the property building.  (Id.

¶ 13).  Latimore then conducted a further inspection of his possessions, and determined

that a correctional officer had "torn 3 pages out of his missing pad and folded them in

half and strategically placed them where the plaintiff would find them in between

miscellaneous mail."  (Id. ¶ 14).  He concluded from this evidence that a "DOC employee

or employees [had taken] his music for a specific purpose."  (Id.).  However, Latimore

has not identified the correctional officer who allegedly tore the pages from the missing

legal pad or the employees who allegedly took his music.  Nor has he alleged any facts

supporting his assumption that the music was taken intentionally rather than lost or

misplaced.

Allegedly, "[t]he 3 Pages torn out of the missing music pad were STG related

material[,]" which is typically confiscated as contraband and disposed of in accordance

with certain DOC regulations.  (Id. ¶ 15).  The plaintiff claims that he informed IPS and

the property department about the STG related material and the fact that he was still

missing some of his music.  (Id. ¶ 17).  Thereafter, defendant King allegedly asked the plaintiff more questions about his involvement in STG activity, and "implied that he would look into the plaintiffs [sic] missing music if he admitted to his STG activity." (Id.).  Latimore denied that he had any involvement in such activity.  (Id.).

The plaintiff claims that "[i]t became apparent that as a result of denying his involvement in a STG, IPS with the help of the property department conspired to deprive the plaintiff of all of the music he had composed in the previous 12 months."  (Id.).  Thus, he alleges that his property was confiscated and destroyed, and that the destruction occurred without giving the plaintiff prior notice or an opportunity to challenge the confiscation.  (Id. ¶ 18).  However, Latimore has not explained how these allegations can be reconciled with the fact that Sullivan returned nine of his ten legal pads to him.  (See id. ¶ 12).  Moreover, he has alleged no facts showing that any of the named defendants were involved in the alleged deprivations.

Latimore became deeply distressed about the loss of his property, and wrote a flurry of letters to various staff and administrative personnel at MCI-Norfolk, including defendants Roden and Sumner.[3]  (Id. ¶¶ 20-21).  He claims that all of his letters to the

---

[3]  It is unclear from the complaint whether Latimore's letters about his allegedly missing property were written before he recovered most of his property from Sullivan in September 2011, or after he discovered that one legal pad remained missing.  Although he claims that he began writing letters after his discussion with King about the missing legal pad, he also alleges that he wrote numerous letters to staff and administrative personnel over the course of August and September 2011.  (See Compl. ¶¶ 17-21).  Therefore, the chronology of events is somewhat inconsistent.

administration were left unanswered, and that it became clear, even after he had spoken to the Superintendent's office, that he was not going to recover his legal pad.  (Id. ¶ 22). As a result of his frustration, Latimore became confrontational toward personnel at MCI-Norfolk.  (Id. ¶ 24).  Although the plaintiff allegedly conveyed to various prison personnel, including individuals from IPS and the property department, that his behavior stemmed from his agitation over his missing legal pad, Latimore claims that no action was taken to return his property to him.  (See id. ¶¶ 24-25).  Again, Latimore has not pleaded any facts to support a conclusion that the missing materials were being intention-ally withheld, as opposed to being lost or msplaced.

Latimore claims that at some point in the Fall of 2011, "DOC personnel began to retaliate against the plaintiff for wanting his property returned."  (Id. ¶ 26).  Although the plaintiff has not alleged any facts describing the nature of the retaliatory conduct or identifying the individuals involved, he claims that the retaliation ultimately culminated in an assault against him by Correctional Officer Poon on November 2, 2011.  (Id.). Latimore's subsequent grievance regarding Officer Poon's conduct triggered an internal investigation, which was still ongoing at the time Latimore filed his complaint in this case.  (Id. ¶ 27; Pl. Ex. 1 at 18).  Accordingly, the plaintiff has not asserted any claims against Officer Poon in this action.  (See Compl. ¶ 27).

On November 16, 2011, before any hearing could be held on the alleged assault, Latimore was transferred to MCI-Walpole.  (Id.).  Latimore claims that the transfer occurred because "[t]he DOC did not want to subject the C/O Poon to a tape-recorded

hearing knowing he was guilty of assault and would be questioned by Mr. Latimores'
attorney on the allegations of assault." (Id.).  However, he does not allege that any of the
individual defendants took part in the transfer decision.  Nor does he allege that the
transfer was related to any complaints he made about his missing property.

### Alleged Deprivation of Property at MCI-Walpole

Shortly before leaving MCI-Norfolk, Lieutenant Houle, an employee at the prison,
inventoried all of the property that would be transferred with Latimore to MCI-Walpole.
(Id. ¶ 30).  As reflected on the Property Inventory Form that was prepared by Lieutenant
Houle, that property included the nine legal pads containing music and business plans
that Latimore had recovered from defendant Sullivan.  (Id.; Pl. Ex. 2 at 2).  Latimore
claims that he personally carried the legal pads with him to MCI-Walpole and delivered
them to the receiving building.  (Id. ¶ 31).  He further claims that during the intake
process at MCI-Walpole, he witnessed defendant Park and two unnamed IPS officers
searching through his property.  (Id. ¶ 32).  According to the plaintiff, it was clear that the
officers were searching for something specific, and he claims that "there was a good
chance the plaintiffs' property was being destroyed and taken due to the IPS actions in
Walpole intake. . . ." (Id. ¶ 35).  However, Latimore has not alleged any facts to
substantiate this conclusory assertion.

Upon his arrival at MCI-Walpole, Latimore was housed in the facility's DDU.
(Id.).  On November 18, 2011, Latimore wrote to defendant Sinclair, the DDU property
sergeant, to request the return of the property that he had brought with him from MCI-

Norfolk.  (Id. ¶ 34).  Latimore contends that on November 23, 2011, he received less than half of the property he had brought with him to MCI-Walpole.  (Id. ¶ 36).  In particular, Latimore alleges that he was missing six of his nine remaining legal pads, as well as personal mail and family pictures.  (Id. ¶ 39).  He further alleges that the inventory sheet that had been filled out by Lieutenant Houle at MCI-Norfolk was missing as well.  (Id. ¶ 37).  Consequently, the plaintiff was unable to convince Sinclair that additional property existed and was still missing.  (Id.).

Latimore claims that at that point it had become clear to him that DOC staff had engaged in a "multi-level conspiracy to deprive the plaintiff of his property[.]"  (Id. ¶ 38). Thus, he contends that members of the IPS and property units at both MCI-Norfolk and MCI-Walpole engaged in a coordinated and intentional effort to take and destroy six of his nine remaining legal pads for no reason other than to harass and intimidate him.  (Id. ¶ 33).  Latimore has not alleged any facts to support his conclusory assertion of such a coordinated effort.  In addition, as described below, Latimore concedes by his own allegations that the defendants in this action consistently denied having any knowledge as to the whereabouts of the missing property, and he has not alleged any facts which would support a conclusion that the denials were false.  Rather, Latimore has alleged that the defendants have repeatedly insisted that to their knowledge, the plaintiff received all of his property that could be found in the facility's possession.

On November 28, 2011, Latimore asked the DDU property sergeant, Sinclair, whether there was additional property that the plaintiff had not received.  (Id. ¶ 40).

Allegedly, Sinclair informed the plaintiff that he had checked the property building himself, that there was nothing in there belonging to the plaintiff, and that he was unable to assist the plaintiff further.  (Id.).  Sinclair also advised Latimore that he could write to defendants Swanson and Ballentine in the main property building to find out if they knew anything about the missing items, and could also file a grievance with the Internal Grievance Coordinator, defendant Stork.  (Id.).  Latimore claims that he wrote to Swanson and Ballentine that same day, and that he spoke to three other prison employees about his property issue.  (Id. ¶¶ 41-42).  He contends that he received no response from Swanson or Ballentine, and that none of the other officers were able to resolve the matter. (Id.).

## Latimore's Use of the Grievance Process

Allegedly, Latimore questioned Sinclair again about the missing property, and Sinclair instructed the plaintiff to file a grievance.  (Id. ¶ 44).  Accordingly, Latimore filed two grievances with defendant Stork in which he requested the return of his property and described Park's search of his property upon his arrival at the facility, "which was the first step that resulted in the plaintiff's property being unaccounted for."  (Id. ¶¶ 44, 46). He also sent letters to defendant Saba, the Superintendent of MCI-Walpole, and defendant Thibault, the Deputy Superintendent, in which he complained about his missing property and about Park's search of his possessions.  (Id. ¶¶ 44, 46-47). Additionally, on December 6, 2011, Latimore allegedly discussed his property issues with DDU Captain Grimes, who has not been named as a defendant in this case.  (Id. ¶ 48).

Allegedly, Captain Grimes spoke about the matter with defendant Park, who acknowledged that he had seen the plaintiff during the intake process, but denied any knowledge regarding the whereabouts of Latimore's missing property.  (Id.).

On December 6, 2011, the Deputy Commissioner at MCI-Walpole, the defendant Thibault, sent a letter to Latimore informing him that his correspondence to Saba had been referred to her office for a reply.  (Pl. Ex. 2 at 11).  She further stated as follows with respect to the plaintiff's property:

> Please be advised that on November 22, 2011 [the facility's] Property Department forwarded all of your "paperwork, and pads of paper" to the Department Disciplinary Unit.  Enclosed with this correspondence is a copy of your Property Inventory, there is no property being with held from you.

(Id.).  Thus, Thibault denied Latimore's claim that his property had been taken and intentionally withheld.

The plaintiff claims that on December 12, 2011, defendant Stork came to speak with him about the circumstances giving rise to his grievances and how to resolve the situation.  (Compl. ¶ 50).  Latimore further claims that within minutes after speaking with Stork, defendant Park came to speak with him about what had occurred during the intake process.  (Id.).  According to the plaintiff, Park provided no explanation for his search of the plaintiff's property, but denied that he had taken any of Latimore's belongings.  (Id.).  Park also told Latimore that he would contact O'Malley at MCI-Norfolk and ask for a copy of the inventory forms listing the property that had been transferred from that facility to MCI-Walpole.  (Id.).

The plaintiff contends that he did not trust either Park or O'Malley due to their "apparent involvement in the property conspiracy at both Norfolk and Walpole[.]"  (Id. ¶ 51).  Accordingly, he sent letters to the superintendent's office at MCI-Norfolk to request his own copies of the inventory forms.  (Id. ¶¶ 52, 54).  On December 22, 2011, defendant Grossi, the Director of Security at MCI-Norfolk, replied to Latimore's correspondence and provided the plaintiff with copies of his property inventory forms from MCI-Norfolk.  (Pl. Ex. 2 at 14).  In his letter to the plaintiff, Grossi wrote that the inventory forms "support what you say in your letter about the missing notepads[,]" and he advised Latimore to "contact the Property Department at [MCI-Walpole] to inquire about your missing property."  (Id.).  Thus, according to Grossi, all of Latimore's personal property had been transferred with him to Walpole.

Following his receipt of Grossi's letter, Latimore wrote to defendant Swanson to inform him that the plaintiff had evidence substantiating the missing legal pads.  (See Compl. ¶ 57).  He also filed a third grievance regarding his missing property.  (Id.).  On January 5, 2012, Latimore received a brief response from Swanson stating that "[a]ll these 'legal pads' that were received were forwarded."  (See id. ¶ 58; Pl. Ex. 2 at 17).  Thus, Swanson denied that any of Latimore's property had been withheld from him.

The plaintiff claims that on January 10, 2012, he spoke directly to Superintendent Saba regarding his property issues, and showed Saba his inventory forms and the correspondence from defendant Grossi stating that the forms supported Latimore's claim regarding the missing legal pads.  (Id. ¶ 59).  According to Latimore, Saba told the

plaintiff to write to him directly, and stated that he would address the issue personally.

(Id.).  Latimore complied, and wrote to Saba that same day.  (Id. ¶ 61).  Six days later, on

January 16, 2012, defendant Stork visited the plaintiff and spoke with him about his third

grievance.  (Id. ¶ 60).  Latimore showed Stork the inventory forms, as well as the

correspondence from defendant Grossi.  (Id.).

Despite Latimore's efforts to convince the defendants that his property remained

missing, Stork denied all three of his grievances on January 16, 2012.  (See Pl. Ex. 2 at 7,

9, 15).  In his responses to the plaintiff's grievances, Stork explained his decision as

follows:

> Your grievance is denied as the property has forwarded all of your
> property received [from] MCI Norfolk, including writing tablets,
> legal documents, personal photos, and papers to you in the DDU.
> The property dept is not withholding any personal papers or legal
> items, your only items being held in the DDU-excess area are boxer
> shorts, t-shirts, socks, shower shoes, and cosmetics.

(Id.).  Thus, Stork's responses to the plaintiff's grievances were consistent with state-

ments made by other defendants in which they denied that any of Latimore's legal pads

had been withheld.

Latimore appealed the denial of his grievances.  (See Pl. Ex. 2 at 18-24).  He also

filed a new grievance regarding the loss of his property.  (Compl. ¶ 62; Pl. Ex. 2 at 25).

On February 2, 2012, Stork denied the new grievance, stating that the issue had already

been addressed by the plaintiff's prior grievances.  (Pl. Ex. 2 at 25).  He also informed

Latimore that the grievance office considered the matter closed, and that any further

grievances on the issue would result in the suspension of Latimore's grievance privileges. (Id.).

On February 10, 2012, Latimore wrote a letter to Saba in which he complained about the lack of an adequate response to his claims. (Compl. ¶ 63). On February 13, 2012, Saba sent Latimore a letter in which he informed Latimore that he had until March 9, 2012 to respond to the plaintiff's appeals. (Id.; Pl. Ex. 2 at 27). Saba further assured Latimore that "this matter will be thoroughly reviewed" and that the plaintiff would receive a response in accordance with applicable DOC regulations. (Pl. Ex. 2 at 27).

Notwithstanding Saba's assurances, Latimore attempted to conduct a further investigation into the circumstances surrounding his missing property. (Compl. ¶ 64). Accordingly, Latimore began to inquire about the identity of the officers who had signed the inventory sheets that he had received from the Walpole property department. (Id.). Latimore claims that he was particularly interested in the identity of the officer who had inventoried the plaintiff's property on November 22, 2011, one day before the plaintiff's property was delivered to him in the DDU. (Id.). However, the plaintiff contends that when he asked DDU Captain Grimes and defendant Sinclair to identify the signature on the inventory form and to tell him who had been conducting inventory work that day, Sinclair denied knowing whose signature was on the form, and Captain Grimes refused to review the roster to determine who had been working in the property department on November 22, 2011. (Id. ¶ 65).

Subsequently, Latimore sent another letter to Saba in which he complained about Captain Grimes' response to his request for information and threatened to file a lawsuit based on the theft of his property.  (Id. ¶ 66; Pl. Ex. 2 at 28-29).  On March 8, 2012, Saba wrote to inform the plaintiff that the time to respond to his appeal had been extended "so that this matter can be thoroughly reviewed with the appropriate personnel."  (Pl. Ex. 2 at 30).  The appeal was extended again in April 2011.  (Id. at 31-32).  Finally, on May 14, 2012, Saba issued a decision stating that he concurred with the Internal Grievance Coordinator, and that Latimore's appeals were denied.  (Id. at 32-33).

Additional factual details relevant to this court's analysis are provided below where appropriate.

### III.  ANALYSIS

By his complaint, the plaintiff has asserted fifteen separate causes of action against the defendants arising from the alleged confiscation and destruction of his legal pads. Counts II-VIII and XV consist of claims brought under Section 1983 for conspiracy to deprive Latimore of his civil rights (Count II), for violations of his rights under the First, Fourth, Fifth, Eighth and Fourteenth Amendments to the Constitution (Counts III-VIII), and for supervisory liability based on alleged deliberate indifference by defendants working in the superintendents' offices (Count XV).  Counts I and IX-XIV consist of claims for violations of state law.  They include claims for conversion (Count I), for violations of Latimore's rights under the Massachusetts Declaration of Rights (Counts IX-XI) and the Massachusetts Civil Rights Act (Count XII), for intentional infliction of

emotional distress (Count XIII), and for violations of DOC regulations relating to the

retention, seizure and disposal of inmate property (Count XIV).  The defendants have

moved to dismiss all of these claims on the grounds that the complaint fails to comply

with the pleading requirements of Fed. R. Civ. P. 8(a) or to state a claim for relief under

Fed. R. Civ. P. 12(b)(6).  They also contend that Latimore's allegations plead nothing

more than a state law tort claim, and they have moved to dismiss the complaint, pursuant

to Fed. R. Civ. P. 12(b)(1), on the grounds that this court lacks subject matter jurisdiction

over the action.  Because this court finds that dismissal is warranted for failure to state a

claim under Rule 12(b)(6), it is unnecessary to address the remaining grounds for relief

asserted by the defendants under Rules 8(a) and 12(b)(1).

> ### A.   <u>Motion to Dismiss Standard of Review</u>

Motions to dismiss under Rule 12(b)(6) test the sufficiency of the pleadings.

Thus, when confronted with a motion to dismiss, the court accepts as true all well-

pleaded facts and draws all reasonable inferences in favor of the plaintiff.  <u>Cooperman</u>,

171 F.3d at 46.  Dismissal is only appropriate if the complaint, so viewed, fails to allege a

"plausible entitlement to relief."  <u>Rodriguez-Ortiz v. Margo Caribe, Inc.</u>, 490 F.3d 92, 95

(1st Cir. 2007) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 559, 127 S. Ct. 1955,

1967, 167 L. Ed. 2d 929 (2007)).

"The plausibility inquiry necessitates a two-step pavane."  <u>Garcia-Catalan v.</u>

<u>United States</u>, — F.3d —, 2013 WL 5878960, at *2 (1st Cir. Nov. 4, 2013).  "First, the

court must distinguish 'the complaint's factual allegations (which must be accepted as

true) from its conclusory legal allegations (which need not be credited).'" Id. (quoting

Morales-Cruz v. Univ. of P.R., 676 F.3d 220, 224 (1st Cir. 2012)).  "Second, the court

must determine whether the factual allegations are sufficient to support 'the reasonable

inference that the defendant is liable for the misconduct alleged.'"  Id. (quoting Haley v.

City of Boston, 657 F.3d 39, 46 (1st Cir. 2011)) (additional citation omitted).  This

second step requires the reviewing court to "draw on its judicial experience and common

sense."  Id. (quoting Ashcroft v. Iqbal, 556 U.S. 662, 679, 129 S. Ct. 1937, 173 L. Ed. 2d

868 (2009)).  "If the factual allegations in the complaint are too meager, vague, or

conclusory to remove the possibility of relief from the realm of mere conjecture, the

complaint is open to dismissal."  Morales-Cruz, 676 F.3d at 224 (quoting SEC v.

Tambone, 597 F.3d 436, 442 (1st Cir. 2010)).

### B.    Claims Under Section 1983 – In General

All of Latimore's federal claims against the defendants have been brought pursuant

to Section 1983.  "A claim under section 1983 has two essential elements.  First, the

challenged conduct must be attributable to a person acting under color of state law" and

"second, the conduct must have worked a denial of rights secured by the Constitution or

by federal law."  Soto v. Flores, 103 F.3d 1056, 1061 (1st Cir. 1997).  In the instant case,

the complaint establishes that at all relevant times, each of the defendants was working as

an employee of the DOC.  Therefore, Latimore has alleged that the defendants were

acting under color of state law, and the issue remaining is whether Latimore's allegations

support a claim that the defendants deprived him of his constitutional rights.

-18-

## Claims Against the DOC

To the extent Latimore is seeking to hold the DOC liable for violations of his constitutional rights, this court finds that he has failed to state a claim.  "States and their agencies are entitled to sovereign immunity 'regardless of the relief sought.'"  Poirier v. Mass. Dep't of Corr., 558 F.3d 92, 97 (1st Cir. 2009) (quoting Kentucky v. Graham, 473 U.S. 159, 167 n.14, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985)).  Because it is an agency of the Commonwealth, the "plaintiff['s] § 1983 claims against the Massachusetts DOC are barred by the Eleventh Amendment."  Hannon v. Beard, — F. Supp. 2d —, 2013 WL 5518980, at *2 (D. Mass. Sept. 27, 2013).  Therefore, all of Latimore's claims against the DOC must be dismissed.

## Claims Against the Individual Defendants

This court also finds, as a general matter, that Latimore's allegations are insufficient to state a claim against any of the individual defendants for violations of his constitutional rights.  All of Latimore's claims are premised upon his conclusory allegations that the defendants were involved in a conspiracy to deprive him of his property.  (See Compl. ¶¶ 1, 17, 38, 51).  However, he has not alleged any specific facts showing that any of the named defendants actually took his property or were responsible for withholding it from him.  Rather, according to Latimore's own allegations, the defendants considered his complaints but nevertheless consistently denied that they were withholding his property or had any knowledge as to the whereabouts of the plaintiff's legal pads.  (See, e.g., id. ¶¶ 13, 40, 48, 50, 58; Pl. Ex. 2 at 7, 9, 11, 15).  The complaint contains no facts

to suggest that the defendants were not being truthful.  Moreover, the complaint shows

that on various occasions, the defendants attempted to assist Latimore by investigating his

claims and taking steps to search for the missing items.  (See, e.g., Compl. ¶¶ 40, 50, 59;

Pl. Ex. 2 at 14, 27). The fact that they were unsuccessful does not support the plaintiff's

conclusory assertion that the defendants engaged in a conspiracy to deprive him of his

property.

In order to hold a defendant liable under Section 1983, a plaintiff must establish

"not only a deprivation of federal right, but also that the defendant's conduct was a cause

in fact of the alleged deprivation."  Soto, 103 F.3d at 1062.  Because the plaintiff has

failed to allege facts showing that any of the individual defendants in this action were

instrumental in the alleged deprivation of his property, he has failed to state a claim for

relief under Section 1983.  Therefore, all of Latimore's federal claims are subject to

dismissal pursuant to Fed. R. Civ. P. 12(b)(6).

### C.    Specific Claims Asserted Under Section 1983

Although this court has determined that Latimore's Section 1983 claims must be

dismissed for failure to allege facts linking the defendants' conduct to the deprivation of

his property, this court also finds that those claims suffer from other deficiencies as well.

Thus, this court concludes that dismissal of the Section 1983 claims is further warranted

for the reasons that follow.

### Claim for Civil Rights Conspiracy

In Count II of his complaint, Latimore claims that the defendants' actions relating to the confiscation of his personal property constituted a conspiracy to deprive him of his constitutional rights.  In order to state a conspiracy claim under Section 1983, "there must be allegations of (1) an agreement between two or more state actors, or 'a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages.'"  Lumpkin v. Lucey, Civil Action No. 09-11921-RGS, 2010 WL 1794400, at *5 (D. Mass. May 4, 2010) (slip op.) (quoting Ciambriello v. County of Nassau, 292 F.3d 307, 324-25 (2d Cir. 2002)).  See also Estate of Bennett v. Wainwright, 548 F.3d 155, 178 (1st Cir. 2008) (defining civil rights conspiracy as "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damages" (quotations and citations omitted)). "[C]omplaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed." Lumpkin, 2010 WL 1794400, at *5 (quoting Ciambriello, 292 F.3d at 325) (additional citations omitted).

Here, Latimore's complaint contains nothing more than conclusory allegations regarding the existence of a conspiracy.  The plaintiff  has not alleged any facts to support the existence of an agreement between two or more of the defendants.  Nor has he alleged facts showing that the defendants acted in concert to withhold Latimore's legal

pads.  Latimore's "mere assertions, without more, cannot establish cognizable legal

claims, nor can the simple use of the term 'conspiracy' be sufficient to create a claim,

without an underlying factual basis for the assertion."  <u>Id.</u>  Therefore, this court finds that

Count II of the complaint fails to state a claim.

## <u>First Amendment Claims</u>

Latimore has asserted two separate claims against the defendants for violations of

his rights under the First Amendment.  Specifically, in Count III, Latimore claims that the

defendants violated his right to free speech by confiscating his property in retaliation for

his grievances regarding the alleged assault on him by Officer Poon.  (<u>See</u> Compl. ¶¶ 87-

88).  In Count IV, he claims that his right to free speech was violated by the alleged

confiscation and destruction of his music and business plans without justification, and by

the defendants' actions in retaliating against him "for his redress of grievance with DOC

administration regarding his property rights and numerous letters written to staff at the

institution."  (<u>See</u> <u>id.</u> ¶¶ 94-97).  Thus, Latimore contends that the defendants violated his

rights under the First Amendment both by depriving him of his writings and by retaliating

against him for filing grievances.

This court finds that Latimore's First Amendment claims cannot survive under either

theory.  "In order to succeed on a First Amendment retaliation claim, a party must show

that [his] conduct was constitutionally protected, and that this conduct was a substantial

factor [or] . . . a motivating factor driving the allegedly retaliatory decision."  <u>Air Sunshine,</u>

<u>Inc. v. Carl</u>, 663 F.3d 27, 35-36 (1st Cir. 2011).  A prisoner "has a First Amendment right

'to petition the government for the redress of grievances[.]'" <u>Shabazz v. Cole</u>, 69 F. Supp. 2d 177, 197 (D. Mass. 1999) (quoting <u>Colon v. Coughlin</u>, 58 F.3d 865, 872 (2d Cir. 1995)).  Therefore, Latimore's conduct in filing grievances relating to the alleged assault by Poon and the alleged failure to return his legal pads constituted constitutionally protected activity.  Nevertheless, Latimore's allegations do not satisfy the second element of a retaliation claim.  According to the complaint, the plaintiff's grievance regarding the alleged assault by Officer Poon was filed in November 2011, two months *after* the disappearance of his legal pad at MCI-Norfolk.  (<u>See</u> Compl. ¶¶ 12-13; Pl. Ex. 1 at 18). Thus, the grievance could not have been a substantial or motivating factor in any alleged confiscation of his property.  Similarly, Latimore alleges that he filed grievances and wrote letters to the administration at MCI-Walpole *after* he discovered that his legal pads were missing and his informal requests for the return of his property proved unsuccessful.  (<u>See</u> Compl. ¶¶ 36-47, 53).  Therefore, any confiscation of his property took place prior to the protected activity and did not occur in retaliation for that activity.

To the extent Latimore is claiming that the Walpole defendants withheld his property in retaliation for filing a grievance against Officer Poon, his claim fares no better. Significantly, Latimore has not alleged that any of the defendants at MCI-Walpole had any knowledge of the grievance, or even any knowledge of the incident involving the alleged assault by Officer Poon.  Therefore, Latimore's first amendment retaliation claims are not plausible and must be dismissed.

As described above, Latimore also claims that his First Amendment rights were violated by the confiscation and destruction of his writings.  This claim also must be dismissed.  "[A] prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system."  Pell v. Procunier, 417 U.S. 817, 822, 94 S. Ct. 2800, 2804, 41 L. Ed. 2d 495 (1974).  Accordingly, "challenges to prison restrictions that are asserted to inhibit First Amendment interests must be analyzed in terms of the legitimate policies and goals of the corrections system[.]"  Id.

The Supreme Court has established four factors that a court must consider in determining whether such restrictions are reasonable.  See Beard v. Banks, 548 U.S. 521, 529, 126 S. Ct. 2572, 2578, 165 L. Ed. 2d 697 (2006).  Specifically, the court must consider: (1) whether there is "a 'valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it'"; (2) whether there are "alternative means of exercising the right that remain open to prison inmates"; (3) "what 'impact . . . accommodation of the asserted constitutional right [will] have on guards and other inmates, and on the allocation of prison resources generally'"; and (4) whether there "are 'ready alternatives' for furthering the governmental interest available[.]"  Id. (quoting Turner v. Safley, 482 U.S. 78, 87, 107 S. Ct. 2254, 96 L. Ed. 2d 64 (1987)).

In the instant case, Latimore claims that the defendants had no legitimate basis for confiscating and destroying his property, and that their only motivation was to cause the plaintiff pain.  (Compl. ¶ 94).  While the confiscation of a prisoner's written work for no

other reason than to cause emotional pain might support a First Amendment claim under the test set forth by the Supreme Court, Latimore's complaint falls short of stating such a claim.  As described above, the plaintiff has failed to allege sufficient facts to show that his legal pads were confiscated rather than lost or misplaced, or that any of the named defendants were responsible for the alleged deprivation.  Therefore, all of Latimore's First Amendment claims must be dismissed for failure to state a plausible claim for relief.

## Fourth Amendment Claim

In Count V of his complaint, Latimore claims that the defendants violated his Fourth Amendment rights by searching and seizing his property "without probable cause or imminent danger to inmate safety or prison security[.]"  (Compl. ¶ 101).  However, the Supreme Court has held that "an inmate, because of his status, enjoy[s] neither a right to privacy in his cell nor protection against unreasonable seizures of his personal effects." Soldal v. Cook Cnty., Ill., 506 U.S. 56, 65, 113 S. Ct. 538, 545, 121 L. Ed. 2d 450 (1992). See Hudson v. Palmer, 468 U.S. 517, 528 n.8, 104 S. Ct. 3194, 3201 n.8, 82 L. Ed. 2d 393 (1984) ("the same reasons that lead us to conclude that the Fourth Amendment's proscription against unreasonable searches is inapplicable in a prison cell, apply with controlling force to seizures").  Therefore, Latimore is foreclosed from pursuing a claim under the Fourth Amendment, and Count V must be dismissed.

## Due Process Claims

Latimore also claims, in Counts VI and VIII, that the defendants deprived him of his right to due process under the Fifth and Fourteenth Amendments by confiscating his

property without adhering to DOC regulations governing the seizure of property. "The Fifth Amendment Due Process Clause . . . applies 'only to actions of the federal government – not to those of state or local governments.'" Martinez-Rivera v. Sanchez Ramos, 498 F.3d 3, 8 (1st Cir. 2007) (quoting Lee v. City of Los Angeles, 250 F.3d 668, 687 (9th Cir. 2001)). Where, as here, the plaintiff "do[es] not allege that any of the defendants are federal actors, any Fifth Amendment claim [is] properly dismissed." Id. at 8-9.

This court also finds that Latimore's Fourteenth Amendment due process claim is not actionable. In Hudson v. Palmer, the Supreme Court held that negligent and intentional deprivations of property caused by state employees "do[] not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available." Hudson, 468 U.S. at 533, 104 S. Ct. at 3204. "There is nothing to suggest that Massachusetts does not provide an adequate remedy for the property losses alleged" in this case. Bemis v. Kelley, 857 F.2d 14, 19 (1st Cir. 1988). See also id. (finding that plaintiff's Section 1983 claim based on the intentional taking of his property was not actionable where plaintiff could have sought post-deprivation remedies under Massachusetts law); Johnson v. Fair, 697 F. Supp. 567, 572 (D. Mass. 1988) (dismissing plaintiff's Fourteenth Amendment claim based on destruction of his television set by prison guards where plaintiff could have pursued post-deprivation remedies against the defendants under the Massachusetts Tort Claims Act). In fact, Latimore has asserted a state law tort claim for conversion arising

out of the alleged confiscation and destruction of his property.  (Compl. ¶¶ 70-73).

Therefore, his claim for relief under the Fourteenth Amendment also must be dismissed.

### Eighth Amendment Claim

In Count VII, Latimore claims that the defendants' actions in depriving him of his

legal pads subjected him to cruel and unusual punishment in violation of his rights under

the Eighth Amendment.  In particular, he claims that the confiscation of his property

"caused severe mental distress to the plaintiff and resulted in long-term mental issues that

are still continuing to this day."  (Compl. ¶ 113).  For the reasons that follow, this court

finds that the alleged deprivation is not sufficiently severe to state a claim for relief under

the Eighth Amendment.

The Eighth Amendment "imposes the constitutional limitation upon punishments:

they cannot be 'cruel and unusual.'"  Rhodes v. Chapman, 452 U.S. 337, 345, 101 S. Ct.

2392, 2398, 69 L. Ed. 2d 59 (1981).  Accordingly, the Eighth Amendment imposes duties

upon prison officials to "provide humane conditions of confinement; prison officials must

ensure that inmates receive adequate food, clothing, shelter, and medical care, and must

'take reasonable measures to guarantee the safety of inmates[.]'"  Farmer v. Brennan, 511

U.S. 825, 832, 114 S. Ct. 1970, 1976, 128 L. Ed. 2d 811 (1994) (quoting Hudson v.

Palmer, 468 U.S. at 526-27, 104 S. Ct. at 3200).  However, "the Constitution does not

mandate comfortable prisons[.]"  Rhodes, 452 U.S. at 349, 101 S. Ct. at 2400.  Thus,

conditions that do "not lead to deprivations of essential food, medical care, or sanitation .

. . or create other conditions intolerable for prison confinement" do not amount to an Eighth Amendment violation.  <u>Id.</u> at 348, 101 S. Ct. at 2400.

Latimore's assertion that the defendants deprived him of his legal pads falls far short of the type of "extreme deprivations" that are required to make out an Eighth Amendment claim.  <u>See</u> <u>Hudson v. McMillian</u>, 503 U.S. 1, 8-9, 112 S. Ct. 995, 1000, 117 L. Ed. 2d 156 (1992) ("only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation" (quotations and citation omitted)).  Furthermore, because the plaintiff has failed to allege any type of physical injury, his Eighth Amendment claim for mental distress is precluded by the Prisoner Litigation Reform Act, 42 U.S.C. § 1997e(e).  That statute "bars a prisoner's action for compensatory damages based on mental or emotional injuries suffered in custody, absent a showing of 'physical injury.'"  <u>Restucci v. Clarke</u>, 669 F. Supp. 2d 150, 159 (D. Mass. 2009) (quoting 42 U.S.C. § 1997e(e)).  Accordingly, Count VII is dismissed for failure to state an Eighth Amendment claim.

**<u>Supervisory Liability</u>**

Latimore's final claims under Section 1983, which are set forth in Count XV of the complaint, consist of claims against supervisory defendants in the superintendents' offices based on their alleged failure to supervise their staff in order to prevent the loss of Latimore's property, or to remedy the situation once they learned about the loss.  This court finds that Count XV must be dismissed for the reasons described below.

"It is well-established that 'only those individuals who participated in the conduct that deprived the plaintiff of his rights can be held liable'" under Section 1983.  Velez-Rivera v. Agosto-Alicea, 437 F.3d 145, 156 (1st Cir. 2006) (quoting Cepero-Rivera v. Fagundo, 414 F.3d 124, 129 (1st Cir. 2005)).  In the instant case, Latimore does not contend that the supervisory defendants directly participated in the alleged confiscation and/or destruction of his property.  (See Compl. ¶¶ 156-62).  Instead, he is seeking to hold them liable for failing to adequately supervise their staff.  As the First Circuit has explained:

> [u]nder 42 U.S.C. § 1983, a supervisory official may be held liable for the behavior of his subordinates only if "(1) the behavior of [his] subordinates results in a constitutional violation, and (2) the [supervisor]'s action or inaction was affirmative[ly] link[ed] to that behavior in the sense that it could be characterized as supervisory encouragement, condonation or acquiescence or gross negligence amounting to deliberate indifference."

Pineda v. Toomey, 533 F.3d 50, 54 (1st Cir. 2008) (quoting Lipsett v. Univ. of P.R., 864 F.2d 881, 902 (1st Cir. 1988)) (alterations in original).  Latimore's complaint fails to satisfy either of these requirements.

As described above, Latimore has not alleged sufficient facts to show that any of the subordinate officers were responsible for the loss of his property or did anything to violate his constitutional rights.  Therefore, his claims for supervisory liability must fail.  Moreover, the complaint fails to allege an affirmative link between the supervisors' actions and the alleged confiscation of Latimore's property.  Although Latimore has alleged that his letters to the administration at MCI-Norfolk regarding the disappearance

-29-

of his legal pad were never answered, he has not alleged any facts showing that Roden or

Sumner encouraged anyone to withhold the plaintiff's property or otherwise condoned

any improper behavior.  (See Compl. ¶¶ 21-22).  Moreover, Latimore's allegations

demonstrate that Saba, the Superintendent of MCI-Walpole, spoke directly with the

plaintiff about his property issues, encouraged the plaintiff to write to him directly, and

assured the plaintiff that the matter was being "thoroughly reviewed" with the appropriate

personnel.  (Compl. ¶ 59; Pl. Ex. 2 at 27, 30).  Those allegations undermine any

suggestion that supervisory officials at that facility encouraged, condoned or acquiesced

in any unlawful behavior, or were deliberately indifferent to Latimore's constitutional

rights.  Accordingly, Latimore's claims for supervisory liability are insufficient to

withstand the defendants' motion to dismiss.

### D.      State Law Claims

In addition to his claims under Section 1983, Latimore has asserted various claims

against the defendants under Massachusetts state law.  Those claims, which are set forth

in Counts I and IX-XIV of the complaint, include claims for conversion, violations of the

Massachusetts Declaration of Rights, violations of the Massachusetts Civil Rights Act,

intentional infliction of emotional distress, and violations of DOC regulations relating to

the retention, seizure and disposal of inmate property.  The defendants contend that these

claims, like the plaintiff's federal claims, should be dismissed for failure to comply with

the pleading requirements of Fed. R. Civ. P. 8(a) and for failure to state a claim for relief

pursuant to Fed. R. Civ. P. 12(b)(6).  (Def. Mem. (Docket No. 26) at 5).  Because this

court declines to exercise supplemental jurisdiction over these claims, the sufficiency of Latimore's state law pleadings will not be addressed.

"A federal court exercising original jurisdiction over federal claims also has 'supplemental jurisdiction over all other claims that are so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.'" Camelio v. Am. Fed'n, 137 F.3d 666, 672 (1st Cir. 1998) (quoting 28 U.S.C.A. § 1367(a)). "If, however, the court dismisses the foundational federal claims, it must reassess its jurisdiction, this time engaging in a pragmatic and case-specific evaluation of a variety of considerations that may bear on the issue." Id. Those considerations include "the interests of fairness, judicial economy, convenience, and comity." Id. Because "[c]omity is a particularly important concern in these cases[,] . . . the balance of competing factors ordinarily will weigh strongly in favor of declining jurisdiction over state law claims where the foundational federal claims have been dismissed at an early stage in the litigation." Id.

Consideration of the relevant factors compels the conclusion that this court decline to exercise jurisdiction over Latimore's state law claims. Because this case is at an early stage, the need to litigate the case in the state court would cause no undue delay or duplicative effort, and would not result in prejudice to either party. See id. (finding that parties would not be prejudiced by remand of the state law claims to state court where "the court dismissed the only federal claims well before trial"); Perkins v. City of Attleboro, — F. Supp. 2d — , 2013 WL 5229845, at *20 (D. Mass. Sept. 17, 2013)

(declining to exercise supplemental jurisdiction over state law claims where "the litigation has not proceeded to a stage where litigating the matter in state court would cause undue delay or duplicative effort" (quotations and citation omitted)).  Additionally, even though the defendants have moved to dismiss the state law claims on the merits, they have not provided any analysis with respect to those claims.  Therefore, it would be more appropriate for this court to leave any such analysis to the state court.  See Perkins, 2012 WL 5229845, at *16 (declining to exercise supplemental jurisdiction where "defendants have not addressed the sufficiency of the pleadings [supporting] the state law claims").  Finally, the First Circuit has emphasized that "[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." Camelio, 137 F.3d at 672 (quoting United Mine Workers v. Gibbs, 383 U.S. 715, 726, 86 S. Ct. 1130, 1139, 16 L. Ed. 2d 218 (1966)).  Therefore, the most appropriate course of action in this case is to dismiss the state law claims without prejudice to the plaintiff's right to raise them again in an appropriate forum.

## IV.  CONCLUSION

For all the reasons detailed herein, the "Defendants Motion to Dismiss" (Docket No. 25) is ALLOWED.  Counts II-VIII and XV are hereby dismissed, pursuant to Fed. R. Civ. P. 12(b)(6), for failure to state a claim.  Because this court declines to exercise supplemental jurisdiction over the plaintiff's state law claims, Counts I and IX-XIV are dismissed without prejudice.

   / s / Judith Gail Dein
Judith Gail Dein
U.S. Magistrate Judge